47 Cal.4th 1258 (2010)
104 Cal. Rptr. 3d 165
223 P.3d 31
In re E.J. on Habeas Corpus.
In re S.P. on Habeas Corpus.
In re J.S. on Habeas Corpus.
In re K.T. on Habeas Corpus.
Nos. S156933, S157631, S157633, S157634.
Supreme Court of California.
February 1, 2010.
*1262 Prison Law Office, Donald Specter, Vibeke Norgaard Martin, Rachel Farbiarz; Rosen, Bien & Galvan, Ernest Galvan, Nura Maznavi, Loren Stewart and Shirley Huey for Petitioners.
Law Offices of Edward Baum and Edward Baum as Amici Curiae on behalf of Petitioners.
Christina Allbright for California Coalition on Sexual Offending and The Association for the Treatment of Sexual Abusers as Amici Curiae on behalf of Petitioners.
*1263 Alan L. Schlosser and Michael T. Risher for American Civil Liberties Union of Northern California as Amicus Curiae on behalf of Petitioners.
Gary Steven Bowman, in pro. per., as Amicus Curiae on behalf of Petitioners.
Robert Jacob Goldenflame, in pro. per., as Amicus Curiae on behalf of Petitioners.
Mennemeier, Glassman & Stroud, Kenneth C. Mennemeier and Kelcie M. Gosling for Respondent Secretary of the California Department of Corrections and Rehabilitation.

OPINION
BAXTER, J. 
On November 7, 2006, the voters enacted Proposition 83, The Sexual Predator Punishment and Control Act: Jessica's Law (Prop. 83, as approved by voters, Gen. Elec. (Nov. 7, 2006); hereafter Proposition 83 or Jessica's Law). Proposition 83 was a wide-ranging initiative intended to "help Californians better protect themselves, their children, and their communities" (id., § 2, subd. (f)) from problems posed by sex offenders by "strengthen[ing] and improv[ing] the laws that punish and control sexual offenders" (id., § 31).
Among other revisions to the Penal Code,[1] Proposition 83 amended section 3003.5, a statute setting forth restrictions on where certain sex offenders subject to the lifetime registration requirement of section 290[2] may reside. New subdivision (b), added to section 3003.5, provides: "Notwithstanding any other provision of law, it is unlawful for any person for whom registration is required pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather." (§ 3003.5, subd. (b) (section 3003.5(b)).) The new residency restrictions took effect on November 8, 2006, the effective date of Proposition 83.
Subsequent to Proposition 83's enactment, the California Department of Corrections and Rehabilitation (CDCR) sought to enforce section 3003.5(b) as a statutory parole condition by serving notice on registered sex offenders released on parole after November 8, 2006, including these petitioners, *1264 requiring them to comply with the mandatory residency restrictions or face revocation of parole and reincarceration.
The unified petition for writ of habeas corpus here before us was filed by four registered sex offender parolees subject to the new mandatory residency restrictions. In each case, the petitioner was convicted of a sex offense or offenses, for which lifetime registration was required pursuant to section 290, well before the passage of Proposition 83. In each case, the petitioner was released from custody on his current parole after November 8, 2006, the effective date of the new law.
At the threshold, petitioners contend that enforcement of section 3003.5(b)'s residency restrictions as to them constitutes an impermissible retroactive application of the statute, in contravention of the general statutory presumption that Penal Code provisions operate prospectively (§ 3), because it attaches new legal consequences to their convictions of registrable sex offenses suffered prior to the passage of Proposition 83. In a closely related argument, petitioners contend that such retroactive enforcement of section 3003.5(b) further violates the ex post facto clauses of the United States and California Constitutions insofar as it "`makes more burdensome the punishment for a crime, after its commission.'" (Collins v. Youngblood (1990) 497 U.S. 37, 42 [111 L.Ed.2d 30, 110 S.Ct. 2715].) Petitioners also contend section 3003.5(b) is an unreasonable, vague, and overbroad parole condition that infringes on various federal and state constitutional rights, including their privacy rights, property rights, right to intrastate travel, and substantive due process rights under the federal Constitution.
We issued orders to show cause with respect to each petitioner's claims, making them returnable before this court. We stayed enforcement of section 3003.5(b) as to these four named petitioners and consolidated their actions for purposes of briefing and oral argument in this court.
We have determined that petitioners' retroactivity and ex post facto claims, common to all four petitioners, can be addressed on the record currently before us. We conclude they lack merit and must be denied.
(1) Petitioners' remaining claimsthat section 3003.5(b) is an unreasonable, vague and overbroad parole condition that infringes on a number of their fundamental constitutional rightspresent considerably more complex "as applied" challenges to the enforcement of the new residency restrictions *1265 in the respective jurisdictions to which each petitioner has been paroled. Petitioners are not all similarly situated with regard to their paroles. They have been paroled to different cities and counties within the state, and the extent of housing in compliance with section 3003.5(b) available to them during their terms of parolea matter critical to deciding the merits of their "as applied" constitutional challengesis not factually established on the declarations and materials appended to their petition and traverse. With regard to petitioners' remaining constitutional claims, evidentiary hearings will therefore have to be conducted to establish the relevant facts necessary to decide each claim.
The trial courts of the counties to which petitioners have been paroled are in the best position to conduct such hearings and find the relevant facts necessary to decide the remaining claims in their respective jurisdictions. These would include, but are not necessarily limited to, establishing each petitioner's current parole status; the precise location of each petitioner's current residence and its proximity to the nearest "public or private school, or park where children regularly gather" (§ 3003.5(b)); a factual assessment of the compliant housing available to petitioners and similarly situated registered sex offenders in the respective counties and communities to which they have been paroled; an assessment of the way in which the mandatory parole residency restrictions are currently being enforced in those particular jurisdictions; and a complete record of the protocol CDCR is currently following to enforce section 3003.5(b) in those jurisdictions consistent with its statutory obligation to "assist parolees in the transition between imprisonment and discharge." (§§ 3000, subd. (a)(1), 3074.)
Accordingly, the petition for writ of habeas corpus and orders to show cause previously issued with regard to each petitioner's remaining claims shall be ordered transferred to the appropriate Courts of Appeal with directions that each matter be transferred to the trial court in the county to which the petitioner has been paroled, for further proceedings consistent with the views expressed herein.

I. STATEMENT OF THE CASE

A. Proposition 83 and CDCR's enforcement of section 3003.5(b)

Proposition 83 was submitted to the voters on the November 7, 2006 ballot. The purpose of the initiative was described in section 2, which explains that "[s]ex offenders have a dramatically higher recidivism rate for their crimes than any other type of violent felon," that they "prey on the most innocent members of our society," and that "[m]ore than two-thirds of the victims of rape and sexual assault are under the age of 18." (Prop. 83, § 2, *1266 subd. (b).) Section 2 further declares that "Californians have a right to know about the presence of sex offenders in their communities, near their schools, and around their children" (id., subd. (g)), and that "California must also take additional steps to monitor sex offenders, to protect the public from them, and to provide adequate penalties for and safeguards against sex offenders, particularly those who prey on children." (Id., subd. (h).) Section 2 also states, "It is the intent of the People in enacting this measure to help Californians better protect themselves, their children, and their communities; it is not the intent of the People to embarrass or harass persons convicted of sex offenses." (Id., subd. (f).)
As explained in the official ballot pamphlet, Proposition 83 sought to achieve its proponents' goal of creating "predator free zones around schools and parks to prevent sex offenders from living near where our children learn and play" through the enactment of mandatory residency restrictions in the form of an amendment to section 3003.5, a statute setting forth restrictions on where certain sex offenders subject to the lifetime registration requirement of section 290 may reside. (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) argument in favor of Prop. 83, p. 46, capitalization & italics omitted (Voter Information Guide).) As noted, the initiative added new subdivision (b) to section 3003.5, making it "unlawful for any person for whom registration is required pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather." (§ 3003.5(b), added by Prop. 83, § 21.)
On August 17, 2007, the Division of Adult Parole Operations (DAPO) of CDCR issued Policy No. 07-36, pertaining to the enforcement of section 3003.5(b) upon parolees. (CDCR, Policy No. 07-36: Implementation of Proposition 83, aka Jessica's Law (Aug. 17, 2007) (Policy No. 07-36).) Under that policy, section 2616 of title 15 of the California Code of Regulations, setting forth grounds for revocation of parole, was revised to add "[v]iolation of the residency restrictions set forth in Penal Code Section 3003.5 for parolees required to register as provided in Penal Code Section 290," as a reportable ground for revocation of parole. (Policy No. 07-36, supra, p. 1; see Cal. Code Regs., tit. 15, § 2616, subd. (a)(15).) The revised policy was applicable to "all parolees required to register as sex offenders pursuant to PC Section 290, released from custody on or after November 8, 2006," including the following parolee categories: "Initial [r]eleases," "Parole [v]iolators [w]ith a [n]ew [t]erm," "Parolees released after having *1267 served a period of revocation," and "Parolees released from any other jurisdiction's custody ...."[3] (Policy No. 07-36, at p. 1.)
Parole units were provided with two lists of registered sex offenders released on parole after November 8, 2006: those who were in compliance, and those who appeared to be out of compliance with the residency restrictions of section 3003.5(b). (Policy No. 07-36, supra, at p. 2.) Each parolee whose residence appeared to be out of compliance was to be served with a "Modified Condition of Parole Addendum" giving him 45 days within which to come into compliance with the residency restrictions or be subject to arrest and reincarceration for violating his parole. (Id., at pp. 5, 9.)

B. Petitioners

Petitioners are four registered sex offender parolees subject to the new mandatory parole residency restrictions.[4] As noted, in each case the petitioner was convicted of a sex offense or offenses for which lifetime registration was required pursuant to section 290 well before the passage of Proposition 83. In each case, the petitioner was released from prison on his current parole (after serving his latest term in prison custody for a nonsex offense) after November 8, 2006, the effective date of section 3003.5(b). Each petitioner was thereafter served with a 45-day letter imposing the residency restrictions as an additional statutory condition of parole.

1. E.J.

Petitioner E.J. was convicted of forcible rape (§ 261, subd. (a)(2)) and robbery of an inhabited dwelling (former § 213.5, subd. (2)) in 1985 when he was 16 years old. The forcible rape conviction subjected him to the lifelong registration requirement of section 290. He served four years nine months in the California Youth Authority and was released in October 1989. In 1993, he was convicted of willful cruelty to a child (§ 273a, subd. (b)) and second degree robbery (§ 212.5). He served two years in prison for those offenses. In 2000, he was convicted of battery (§ 242) and possession of drug paraphernalia (Health & Saf. Code, § 11364). In 2004 he was convicted of failing to *1268 register under section 290, sentenced to prison, and paroled once again in August 2005. Thereafter, he suffered numerous additional parole violations and was returned to prison on three separate occasions. He was last released from prison custody on parole in February 2007, after the effective date of section 3003.5(b).
According to his declaration, in September 2007, E.J. lived with his wife and their children in an apartment in San Francisco. He was informed by his parole agent that his residence was not compliant with section 3003.5(b) and that he would have to locate compliant housing by October 2, 2007, or face revocation of parole. Thereafter, because the original notice was defective, he was given an additional 10 days to comply. E.J. claims his parole agent initially told him there was no compliant housing in San Francisco, but subsequently told him there is a "small area near AT&T Park that is not within 2,000 feet of a school or park." He declares, "I cannot afford to live near AT&T Park, as it is one of the most expensive areas in San Francisco. In addition, I do not believe that I would be able to establish a secure residence near AT&T Park because I believe that some law enforcement officials would consider it a park where children regularly gather." At the time he prepared his declaration, E.J. was unable to move into compliant housing and was preparing to declare himself homeless.

2. S.P.

In 1998, petitioner S.P., then a minor, was tried as an adult and convicted by guilty plea of rape where the victim (a 15-year-old girl) was prevented from resisting by reason of an intoxicating or controlled substance. (§ 261, subd. (a)(3).) He served three years eight months in prison and was released from custody on parole in August 2001. The rape conviction subjected S.P. to lifetime registration under section 290. In 2002, he was convicted of knowingly receiving or concealing stolen property (§ 496, subd. (a)), served an additional four years eight months in prison, and was paroled in August 2006. In early March 2007, S.P. was taken into custody and charged with a parole violation for driving the wrong way down a one-way street while in possession of an open container of alcohol. He pled no contest and was released from custody on parole to Santa Clara County on March 22, 2007, after the effective date of section 3003.5(b).
According to his declaration, in August 2007 S.P. was informed by his parole agent that he was in violation of the residency restrictions because the apartment where he lived with his mother was within 2,000 feet of a daycare facility. He was told that if he did not move by October 11, 2007, he would face parole revocation and return to prison. He asserts his parole agent told him that "it was my responsibility to find compliant housing and that he *1269 could not provide me with any assistance." He asked to transfer his parole out of Santa Clara County but was told by his parole agent that the process would take at least 60 days, by which time he would be in violation of the residency restrictions. At the time he filed his habeas corpus petition, S.P. and his mother had been unable to locate compliant housing in Santa Clara County.

3. J.S.

In 1985, petitioner J.S. was convicted of indecent exposure in Texas pursuant to Texas Penal Code section 21.08, subdivision (a), which provides, "A person commits an offense if he exposes his anus or any part of his genitals with intent to arouse or gratify the sexual desire of any person, and he is reckless about whether another is present who will be offended or alarmed by his act." As a result of his conviction, he has been subject to the lifetime registration requirement of section 290 while residing in California. (See Pen. Code, §§ 290, subd. (c), 290.005, subd. (a).)
After coming to California, J.S. was convicted in 1990 of exhibiting or using a deadly weapon (§ 417, subd. (a)(1)); in 1991 of voluntary manslaughter (§ 192, subd. (a)); in 1999 and 2000 of battery against a current or former spouse, fiancée or cohabitant (§ 243, subd. (e)(1)); and in 2000 of willful infliction of corporal injury on a spouse or roommate (§ 273.5, subd. (a)). Following this last conviction and prison term, J.S. was released on parole to San Diego County in March 2006. In February 2007, his parole was revoked for failure to register. He was returned to prison and again released on parole in May 2007, after the effective date of section 3003.5(b).
According to his declaration, in August 2007 J.S. was informed by his parole agent that he would have to move from his San Diego County residence because it was within 2,000 feet of an elementary school and a park. J.S. asked if he could move to another state; his parole agent initially agreed to help him but thereafter told him the process to transfer his parole out of state could not be completed before he was required to find housing in compliance with section 3003.5(b), and that if he could not do so he would have to declare himself homeless or face parole revocation and return to prison. He thereafter lost his state funding to pay the rent for his noncompliant housing, could not locate compliant housing, and declared himself homeless in late September 2007.

4. K.T.

In 1990, petitioner K.T. was convicted of forcible rape (§ 261, subd. (a)(2)) and forcible oral copulation (§ 288a, subd. (c)(2)), for which he served a five-year prison term, and which convictions subjected him to the registration *1270 requirement of section 290. In 2001, he was convicted of felony grand theft (§ 487), returned to prison, and thereafter released on parole in January 2006. In June 2007, his parole was revoked based on his failure to register under section 290. Following his return to prison for the parole revocation, he was again released on parole to San Diego County in August 2007, after the effective date of section 3003.5(b).
According to his declaration, in August 2007, K.T. was served with formal notice that his residence was not in compliance with section 3003.5(b) because it was within 2,000 feet of an elementary school. At the time K.T. was living with his disabled wife, for whom he provided care, in a house owned by them. At the time he submitted his declaration, K.T. was attempting to find compliant housing. He further indicates he filed an emergency grievance request with CDCR that was denied, with his appeal currently pending.

C. The petition for writ of habeas corpus

On October 4, 2007, E.J., S.P., J.S., and K.T. filed a unified petition for writ of habeas corpus seeking to temporarily and permanently enjoin CDCR from enforcing section 3003.5(b) against them as a statutory condition of their paroles. Petitioners advance a number of challenges to the statute. At the threshold, they contend that enforcement of section 3003.5(b) as to them constitutes an impermissible retroactive application of the statute, in contravention of the general statutory presumption that Penal Code provisions operate prospectively (§ 3), because it attaches new legal consequences to their convictions of registrable sex offenses suffered prior to the passage of Proposition 83. In a closely related argument, petitioners contend that such retroactive enforcement of section 3003.5(b) further violates the ex post facto clauses of the United States Constitution (art. I, § 10) and the California Constitution (art. I, § 9) because it "`makes more burdensome the punishment for a crime, after its commission.'" (Collins v. Youngblood, supra, 497 U.S. at p. 42.) Petitioners also contend section 3003.5(b) is an unreasonable, vague, and overbroad parole condition that infringes on various state and federal constitutional rights, including their privacy rights, property rights, right to intrastate travel, and their substantive due process rights under the federal Constitution.
On October 10, 2007, we issued an order staying enforcement of section 3003.5(b) as to these four petitioners. On December 12, 2007, we issued orders to show cause with respect to each petitioner, returnable in this court.

*1271 II. ANALYSIS

A. Section 3003.5(b) enforced as a mandatory parole condition

(2) Section 3003.5(b) makes it "unlawful for any person for whom registration is required pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather." (§ 3003.5(b).) In the official ballot pamphlet, the proponents of the initiative measure told the voters the intent behind section 3003.5(b) was to create "predator free zones around schools and parks to prevent sex offenders from living near where our children learn and play." (Voter Information Guide, supra, argument in favor of Prop. 83, p. 46, capitalization & italics omitted.) The Legislative Analyst told the voters that a violation of the new provision would constitute a parole violation for registered sex offenders on parole as well as a misdemeanor offense. (Id., analysis of Prop. 83 by Legis. Analyst, p. 44.)
Each petitioner before us is a paroled registered sex offender who specifically challenges CDCR's attempts to enforce the new statutory residency restrictions against him as a ground for revocation of his parole. Section 3003.5 of the Penal Code is found in part 3, title 1, chapter 8 (entitled "Length of Term of Imprisonment and Paroles") and, as the section's language reflects, its provisions are obviously intended to apply to "person[s]... released on parole." (§ 3003.5, subd. (a), italics added.)[5]
For purposes of these habeas corpus proceedings initiated by paroled registered sex offenders against CDCR, we therefore view petitioners as a necessarily included subgroup within the statutory phrase "any person[s] for whom registration is required pursuant to Section 290" (§ 3003.5(b)), namely, those persons for whom registration is required pursuant to Section 290, who were released on parole after November 8, 2006, the effective date of Proposition 83.

B. Retroactivity

Petitioners first claim section 3003.5(b)'s residency restrictions are being impermissibly applied retroactively to them. Specifically, petitioners argue that because they committed the underlying sex offenses that gave rise to the requirement that they register for life pursuant to section 290 well before the *1272 voters enacted section 3003.5(b), the new law retroactively attaches new legal consequences to their prior convictions. Insofar as Jessica's Law fails to explicitly state that any of its provisions are retroactive, petitioners contend that application of the new residency restrictions to them contravenes section 3 of the Penal Code, which provides, as a general matter, that "No part of [the Penal Code] is retroactive, unless expressly so declared." (§ 3.)
(3) "[S]ection 3 reflects the common understanding that legislative provisions are presumed to operate prospectively, and that they should be so interpreted `unless express language or clear and unavoidable implication negatives the presumption.' [Citation.]" (Evangelatos v. Superior Court (1988) 44 Cal.3d 1188, 1208 [246 Cal.Rptr. 629, 753 P.2d 585].) "[I]n the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature or the voters must have intended a retroactive application." (Id. at p. 1209.)
We conclude section 3 is not violated here. Each of these four petitioners was released from custody on his current parole and took up residency in noncompliant housing after section 3003.5(b)'s effective date. Under settled principles of law for determining whether a Penal Code provision is being applied prospectively or retroactively, it is clear that the new residency restrictions here in issue are being prospectively applied to petitioners.
(4) Under its plain language, subdivision (b) applies to "any person for whom registration is required pursuant to Section 290." (§ 3003.5(b).) A convicted sex offender who becomes subject to the registration requirement of section 290 must register "for the rest of his or her life while residing in California, or while attending school or working in California ...." (§ 290, subd. (b).) Accordingly, under the plain language of section 3003.5(b), any convicted sex offender already subject to the lifetime registration requirement who is released from custody on parole, whether it be after serving a term in custody for an initial sex offense conviction, a new sex offense conviction, or a new nonsex offense conviction, becomes subject to the new mandatory residency restrictions for the duration of his parole term. Should he take up residency in noncompliant housing after his release from custody, he will then be subject to parole revocation for a violation of section 3003.5(b). It matters not, under a straightforward application of the language of the statute, whether the registered sex offender is being released on his current parole for a sex or nonsex offense. Since he is already subject to the lifetime registration requirement of section 290, that status, together with his act of moving into noncompliant housing upon his release from custody on parole after the effective date of Proposition 83, subjects him to the residency restrictions of section 3003.5(b). In contrast, under the dissent's interpretation of section 3003.5(b), all of the many thousands of registered sex offenders who *1273 achieved that status prior to November 8, 2006, the effective date of Proposition 83, will enjoy a free lifetime pass from section 3003.5(b)'s residency restrictions, irrespective of their parole status.
Each of the four petitioners before us was convicted of one or more sex offenses requiring that he register for life (§ 290, subd. (b)) years before Jessica's Law was passed. However, each petitioner was not released from custody on his current parole until after the statute's effective date, and each thereafter took up residency in noncompliant housing, making him subject to a reportable parole violation under CDCR's Policy No. 07-36. CDCR takes the position that the statutory presumption against retroactivity of Penal Code provisions (§ 3) is not implicated where, as here, the new residency restrictions are being applied only to registered sex offenders who were released from prison custody on parole and who secured noncompliant housing after the statute's effective date. The relevant case law supports CDCR's position.
The applicable test for determining whether a statute is being applied prospectively or retroactively was explained in People v. Grant (1999) 20 Cal.4th 150 [83 Cal.Rptr.2d 295, 973 P.2d 72] (Grant). In that case we considered whether conviction of the crime of "continuous sexual abuse of a child" (§ 288.5, subd. (a)) for a course of conduct that included acts of child molestation committed both before and after section 288.5's effective date was a retroactive application of the statute. We first observed: "As the United States Supreme Court has recognized, `deciding when a statute operates "retroactively" is not always a simple or mechanical task' (Landgraf v. USI Film Products (1994) 511 U.S. 244, 268 [114 S.Ct. 1483, 128 L.Ed.2d 229]) and `comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event' (id. at p. 270 ...). In exercising this judgment, `familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.' (Ibid.)" (Grant, at p. 157.)
(5) We went on to explain, "In general, application of a law is retroactive only if it attaches new legal consequences to, or increases a party's liability for, an event, transaction, or conduct that was completed before the law's effective date. (Landgraf v. USI Film Products, supra, 511 U.S. 244, 269-270 & fn. 23 ...; see also Rodriguez v. General Motors Corp. (9th Cir. 1994) 27 F.3d 396, 398; Tapia v. Superior Court (1991) 53 Cal.3d 282, 291 [279 Cal.Rptr. 592, 807 P.2d 434]; Kizer v. Hanna (1989) 48 Cal.3d 1, 7 [255 Cal.Rptr. 412, 767 P.2d 679]; People v. Weidert (1985) 39 Cal.3d 836, 851 [218 Cal.Rptr. 57, 705 P.2d 380].) Thus, the critical question for determining retroactivity usually is whether the last act or event necessary to trigger application of the statute occurred before or after the statute's effective date. (Travenol *1274 Laboratories, Inc. v. U.S. (Fed. Cir. 1997) 118 F.3d 749, 752; McAndrews v. Fleet Bank of Massachusetts, N.A. (1st Cir. 1993) 989 F.2d 13, 16.) A law is not retroactive `merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment.' (Kizer v. Hanna, supra, 48 Cal.3d at p. 7.)" (Grant, supra, 20 Cal.4th at p. 157.)
We concluded in Grant, "Here, defendant was convicted of continuous sexual abuse, as defined in section 288.5, after the court instructed the jury to return a verdict of guilty only if it found that one of the required minimum of three acts of molestation occurred after section 288.5's effective date. In other words, defendant could be convicted only if the course of conduct constituting the offense of continuous sexual abuse was completed after the new law became effective. Because the last act necessary to trigger application of section 288.5 was an act of molestation that defendant committed after section 288.5's effective date, defendant's conviction was not a retroactive application of section 288.5 and therefore not a violation of the statutory prohibition against retroactive application of the Penal Code." (Grant, supra, 20 Cal.4th at pp. 157-158.)
(6) Section 3003.5(b) places restrictions on where a paroled sex offender subject to lifetime registration pursuant to section 290 may reside while on parole. For purposes of retroactivity analysis, the pivotal "last act or event" (Grant, supra, 20 Cal.4th at p. 157) that must occur before the mandatory residency restrictions come into play is the registered sex offender's securing of a residence upon his release from custody on parole. If that "last act or event" occurred subsequent to the effective date of section 3003.5(b), a conclusion that it was a violation of the registrant's parole does not constitute a "retroactive" application of the statute.
The facts and holding in Bourquez v. Superior Court (2007) 156 Cal.App.4th 1275 [68 Cal.Rptr.3d 142] (Bourquez) are particularly instructive here, as they involve the question whether another provision of Jessica's Law enacted by Proposition 83 was being applied prospectively or retroactively.
At issue in Bourquez was that portion of Jessica's Law approved by the voters at the November 7, 2006 election that extended the commitment terms of persons determined to be sexually violent predators under the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.) from two years to an indeterminate term. The petitioner in Bourquez claimed that to apply the new indeterminate term for sexually violent predators to individuals like himself who had pending recommitment petitions at the time Proposition 83 was enacted would be an impermissible retroactive application of the new statute. The Bourquez court explained, "Proposition 83 is entirely silent on the question of retroactivity, so we presume it is intended to operate only *1275 prospectively. The question is whether applying its provisions to pending petitions to extend commitment is a prospective application." (Bourquez, supra, 156 Cal.App.4th at p. 1288, italics added.)
The Bourquez court went on to explain that, "[b]ecause a proceeding to extend commitment under the SVPA focuses on the person's current mental state, applying the indeterminate term of commitment of Proposition 83 does not attach new legal consequences to conduct that was completed before the effective date of the law. [Citation.] Applying Proposition 83 to pending petitions to extend commitment under the SVPA to make any future extended commitment for an indeterminate term is not a retroactive application." (Bourquez, supra, 156 Cal.App.4th at p. 1289.)
Significantly, the Bourquez court did not find the fact of, or dates of, the sex offense convictions that first qualified the defendant as a sexually violent predator to be controlling on his retroactivity claim. Rather, since the relevant provision of Jessica's Law pertained to a sexually violent predator's current mental state, the court concluded that to apply the new law to a defendant already under a fixed-term commitment as a sexually violent predator was a prospective, and not an impermissible retrospective, application of the statute.
(7) By parity of reasoning, the provisions of Jessica's Law here under scrutinysection 3003.5(b)'s statutory residency restrictionsare not implicated until a convicted and registered sex offender is released from custody and must take up residency in the community to which he has been paroled. Applying the mandatory residency restrictions to these four petitioners, who were released from prison on parole after the effective date of Jessica's Law, and who thus had ample notice of the necessity of securing housing in compliance with the restrictions at the time they moved into noncompliant housing, is simply not a retroactive application of the new law. (Bourquez, supra, 156 Cal.App.4th at p. 1289.)[6]
It may be that if a registered sex offender was released from custody on his current parole term prior to November 8, 2006, and secured noncompliant housing prior to that date, in which he currently resides, application of the residency restrictions to him would constitute an impermissible retrospective *1276 application of the statute. Under those circumstances, he would not have had notice of the new 2,000-foot "predator free zone" restrictions prior to his release from custody on parole and the securing of his current residence, the conduct to which section 3003.5(b) speaks. (See Doe v. Schwarzenegger (E.D.Cal. 2007) 476 F.Supp.2d 1178, 1179, fn. 1 [holding that § 3003.5(b) could not be applied retroactively to persons convicted of registrable offenses prior to the effective date of the statute "and who were paroled, given probation, or released from incarceration prior to that date"].) However, all four petitioners here were released from custody on their current parole terms, and then secured their noncompliant housing, after the effective date of Jessica's Law. By doing so, they violated a law already in effect, and application of that law to those violations is not "retroactive."
Contrary to petitioners' argument, the fact that they were all convicted of sex offenses giving rise to their status as lifetime registrants pursuant to section 290 well prior to the passage of Jessica's Law does not, in itself, establish that the new parole residency restrictions are now being applied retroactively to them. The decision in People v. Mills (1992) 6 Cal.App.4th 1278 [8 Cal.Rptr.2d 310] (Mills) succinctly explains the point in an analogous context.
The defendant in Mills was convicted in 1981 of felony possession of marijuana for sale. At that time, section 12021, subdivision (a) provided, "Any person who has been convicted of a felony under the laws of ... California ... who owns or has in his possession or under his custody or control any pistol, revolver, or other firearm capable of being concealed upon the person is guilty of a public offense ...." (Italics added.) Subsequently, section 12021, subdivision (a) was amended, effective January 1, 1990, to provide, "Any person who has been convicted of a felony under the laws of ... California ... who owns or has in his or her possession or under his or her custody or control any firearm is guilty of a felony." (Stats. 1989, ch. 1044, § 3, p. 3633, italics added.) After the effective date of the amendment, the defendant brought a shotgun into a sporting goods store to have it repaired. His status as an ex-felon was discovered and he was arrested, charged, and convicted of being a felon in possession of a firearm in violation of amended section 12021, subdivision (a). The defendant appealed, contending the 1990 amendment to section 12021, subdivision (a) was an unconstitutional ex post facto law being applied to him. (Mills, supra, 6 Cal.App.4th at pp. 1281-1282.)
(8) The Mills court first explained that the question whether a new law is being applied retrospectively is closely intertwined with the question whether it is an unconstitutional ex post facto law, because a finding that the law is being applied retrospectively is a threshold requirement for finding it impermissibly ex post facto. For this principle Mills cited the high court's decision *1277 in Weaver v. Graham (1981) 450 U.S. 24 [67 L.Ed.2d 17, 101 S.Ct. 960], which explained that "`two critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.'" (Mills, supra, 6 Cal.App.4th at pp. 1282-1283, quoting Weaver v. Graham, supra, 450 U.S. at pp. 28-29.) Generally, where a new law "retroactively increase[s] the punishment for [a] crime, it [is] retrospective for purposes of the ex post facto test." (Mills, supra, 6 Cal.App.4th at p. 1285.) "The clearest example of [an ex post facto] law is one which defines a new crime and applies its definition retroactively to [punish] conduct which was not criminal at the time it occurred." (Id. at p. 1282.)
The Mills court concluded the defendant's conviction as a felon in possession of a firearm under the amended version of section 12021, subdivision (a)which broadened the definition of the crime from possession of a concealable firearm to possession of any firearmwas neither a retroactive application of the new law nor conviction of an ex post facto law. The court explained, "Here defendant was convicted of conduct, his possession of a shotgun, occurring after the effective date of the statute. His conduct was a violation of the new statute, rather than an increase of punishment for the earlier offense of possessing marijuana for sale. Although the statute only applied to him because of his status as a person convicted of a felony, and the felony conviction occurred before the statute became effective, the fact of his prior conviction only places him into a status which makes the new law applicable to him. The legal consequences of his past conduct were not changedonly a new law was applied to his future conduct." (Mills, supra, 6 Cal.App.4th at p. 1286, fn. omitted.)
The Mills court emphasized that "defendant knew, or should have known, that it was a crime for him to possess a shotgun after January 1, 1990. He had fair warning of the new law, and he did possess a shotgun after that date. [Citation.] His conviction for doing so was not retrospective. Although the new law applied to him because he had the status of a felony offender, he was not additionally punished for possessing marijuana for sale but rather was punished for committing a new crime, possession of a firearm by a felon, after the amendment to the statute became effective. [Citation.]" (Mills, supra, 6 Cal.App.4th at p. 1289.)
Here, given that petitioners were released on their current parole terms after the effective date of Jessica's Law, petitioners knew, or should have known, that they would be subject to a reportable parole violation if they moved into housing that did not comply with the newly enacted residency restrictions that took effect prior to their release. They are thus presumed to *1278 have had fair notice of the new restrictions applicable to them prior to their release on parole and their securing of noncompliant housing. To require petitioners to comply with the new residency restrictions or face a parole violation for failing to do so is thus not a retrospective application of the law. Although they fall under the new restrictions by virtue of their status as registered sex offenders who have been released on parole, they are not being "additionally punished" for commission of the original sex offenses that gave rise to that status. Rather, petitioners are being subjected to new restrictions on where they may reside while on their current parolerestrictions clearly intended to operate and protect the public in the present, not to serve as additional punishment for past crimes.
The dissent argues that, by finding section 3003.5(b) applies prospectively to lifetime sex registrants who were released on parole and moved to noncompliant housing after the effective date of Proposition 83, we contravene Strauss v. Horton (2009) 46 Cal.4th 364 [93 Cal.Rptr.3d 591, 207 P.3d 48] (Strauss), where we concluded that Proposition 8's state constitutional ban on same-sex marriage cannot be applied retroactively to same-sex couples who married prior to the initiative's effective date. The dissent is wrong. As we explained in Strauss, the affected same-sex couples took affirmative steps in reliance on this court's holding in In re Marriage Cases (2008) 43 Cal.4th 757 [76 Cal.Rptr.3d 683, 183 P.3d 384] that the California Constitution included a right to same-sex marriage. Thus, we observed, "[w]ere Proposition 8 to be applied to invalidate or to deny recognition to marriages performed prior to November 5, 2008 [the date Prop. 8 became effective], rendering such marriages ineffective in the future, such action would take away or impair vested rights acquired under the prior state of the law and would constitute a retroactive application of the measure." (Strauss, supra, at p. 472, italics added.) In other words, unless the voters clearly provided otherwise, Proposition 8 could alter the future right to marry, but it could not negate or undo permanent legal relationships that were allowed indeed protectedby the Constitution at the time they were entered into.
Petitioners here took no affirmative action, prior to the effective date of Proposition 83, in reliance on an earlier state of the law that gave them a "vested right" against future statutory restrictions concerning where they might thereafter establish residency. Nor does Proposition 83 purport to undo any vested rights. As applied to these petitioners, Proposition 83 operates only on actions they took, with fair notice of the new residency restrictions, after the initiative's effective date. That Proposition 83's restrictions on where parolees released after its effective date may thereafter live derives from their prior status as lifetime sex offender registrants does not mean the measure is being applied retroactively to them. The dissent's attempt to invoke Strauss is thus unpersuasive.
*1279 We therefore conclude petitioners' retroactivity claim must be rejected. Enforcing section 3003.5(b)'s residency restrictions against them is a prospective, not a retrospective, application of that law.[7]

C. Ex post facto

Petitioners next make the closely related argument that section 3003.5(b) is an unconstitutional ex post facto law if retroactively applied to them. The claim is unavailing given our conclusion that the law is not being applied retroactively to these petitioners.
(9) Both the United States Constitution (art. I, §§ 9 & 10) and the California Constitution (art. I, § 9) prohibit the passage of ex post facto laws. In Collins v. Youngblood, supra, 497 U.S. 37, the high court explained that an impermissible ex post facto law is one which "`makes more burdensome the punishment for a crime, after its commission.'" (Id. at p. 42.) "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed. [Citations.] The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation. [Citations.] [¶] In accord with these purposes, our decisions prescribe that two critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." (Weaver v. Graham, supra, 450 U.S. at pp. 28-29, some italics added, fns. omitted.) This court has observed that there is no significant difference between the federal and state ex post facto clauses. (Tapia v. Superior Court (1991) 53 Cal.3d 282, 295-297 [279 Cal.Rptr. 592, 807 P.2d 434].)
(10) In In re Ramirez (1985) 39 Cal.3d 931 [218 Cal.Rptr. 324, 705 P.2d 897], we considered whether, under the state and federal ex post facto clauses, a new statutory plan for awarding prison conduct credits could be applied to prisoners whose crimes occurred before the effective date of the new scheme, but whose prison behavior that could lead to a reduction in credits was committed after the new scheme went into effect. (Ramirez, at p. 932.) We concluded that it may. (Ibid.) Applying the test set forth in Weaver v. Graham, supra, 450 U.S. at pages 28-29, to determine whether the new sentencing credit scheme was impermissibly retrospective, we explained, *1280 "For a law to be retrospective, `it must apply to events occurring before its enactment.' [Citation.] A retrospective law violates the ex post facto clauses when it `substantially alters the consequences attached to a crime already completed, and therefore changes "the quantum of punishment."' [Citation.] [¶] We conclude that the 1982 amendments are not retrospective and therefore do not violate the ex post facto clauses. Petitioner, citing [In re Paez (1983) 148 Cal.App.3d 919 [196 Cal.Rptr. 401]], contends that the 1982 amendments relate to the original offense, not to the infraction committed in prison. We disagree. It is true that the 1982 amendments apply to petitioner only because he is a prisoner and that he is a prisoner only because of an act committed before the 1982 amendments. Nonetheless, the increased sanctions are imposed solely because of petitioner's prison misconduct occurring after the 1982 amendments became effective. In other words, the 1982 amendments apply only to events occurring after their enactment. If any aspect of prison life is unconnected to a prisoner's original crime, it would seem to be the sanctions for his misconduct while in prison. Accordingly, the 1982 amendments, which change the sanctions for that misconduct, do not relate to petitioner's original crime and are not retrospective under Weaver [v. Graham]." (In re Ramirez, supra, 39 Cal.3d at pp. 936-937; see also Mills, supra, 6 Cal.App.4th at p. 1285.)
(11) The rationales of In re Ramirez, supra, 39 Cal.3d 931, and Mills, supra, 6 Cal.App.4th at page 1285, apply here and support rejection of petitioners' ex post facto claim. True, section 3003.5(b) applies to these petitioners only by virtue of their status as registered sex offenders, a status they achieved upon their convictions of qualifying sex offenses prior to the enactment of Jessica's Law and section 3003.5(b). Nevertheless, the new residency restrictions apply to events occurring after their effective date petitioners' acts of taking up residency in noncompliant housing upon their release from custody on parole after the statute's effective date. It follows that section 3003.5(b) is not an ex post facto law if applied to such conduct occurring after its effective date because it does not additionally punish for the sex offense conviction or convictions that originally gave rise to the parolee's status as a lifetime registrant under section 290. (Collins v. Youngblood, supra, 497 U.S. at p. 42; Mills, supra, 6 Cal.App.4th at p. 1285.)

D. Petitioners' remaining claims

Petitioners further contend section 3003.5(b) is an unreasonable, vague and overbroad parole condition that infringes on various state and federal constitutional rights, including their privacy rights, property rights, right to intrastate travel, and their substantive due process rights under the federal Constitution. In support of these claims, petitioners have appended declarations and various materials as exhibits to their petition and traverse in an effort to establish a *1281 factual basis for each claim. CDCR, in its return, has denied many of the allegations advanced in the petition in reliance on such exhibits.
In contrast with the retroactivity and ex post facto issues we have addressed above, petitioners' remaining constitutional claims present considerably more complex "as applied" challenges to the enforcement of the new residency restrictions as parole violations in the particular jurisdictions to which each petitioner has been paroled. Petitioners are not all similarly situated with regard to their paroles. They have been paroled to different cities and counties within the state, and the supply of housing in compliance with section 3003.5(b) available to them during their terms of parolea matter critical to deciding the merits of their as-applied constitutional challengesis not sufficiently established by those declarations and materials to permit this court to decide the claims.
For example, petitioners have appended small maps to the petition (exhibit E), which they argue establish that "nearly all of the cities of San Diego, Los Angeles, and San Francisco are off limits [to registered sex offenders released on parole]." But the small maps, comprising almost indiscernible, variably shaded gray areas purporting to depict the scarcity of section 3003.5(b) compliant housing across the state, contain no dates reflecting when they were prepared, no street names or addresses, no indication of where these petitioners are residing in relation to the maps, no indication of the locations of any schools or "parks where children regularly gather," and no legend adequately explaining how the maps were prepared or precisely what they purport to show. CDCR, in turn, has denied the allegations made by petitioners in reliance on the maps, further noting petitioners have not authenticated the maps on which they purport to rely.
As another example, petitioners allege in their traverse that section 3003.5(b) "makes entire cities off-limits to sex offenders, including Petitioners," that under the residency restrictions, "[section 290] registrants [are] unable to find a single compliant home in the cities in which they were paroled," and that the restrictions are "so unreasonably broad" as to leave those to whom it applies "with no option but prison or homelessness, as is the case here." But these allegations appear to conflict with certain materials appended to petitioners' traverse, specifically, a report to the Legislature and Governor's office, prepared in January 2008 by the California Sex Offender Management Board (CASOMB),[8] setting forth "An Assessment of Current Management Practices of Adult Sex Offenders in California." (Exhibit O; *1282 CASOMB Report.) The CASOMB Report indicates, under the subheading "Current Status of Housing Compliance," that "As of December 9, 2007 [13 months after § 3003.5(b) took effect, and two months after the petition for writ of habeas corpus was filed in this court], 3,884 parolees subject to Jessica's Law were under the supervision of a parole agent in California communities. 3,166 of this population reside in compliant housing, while 718 have declared themselves transient.... [¶] Although the 3,884 parolees represent[] the total number of offenders that remain in the community under parole supervision, and CDCR enforcement efforts have resulted in near full compliance with the housing challenges of Jessica'[s] Law, these offenders represent approximately half of the population subject to Jessica's Law released during this period (7516)." (CASOMB Rep., supra, at p. 125, italics added.)
The section 3003.5(b) housing compliance statistics reported in the CASOMB Report for the first year the residency restrictions were in effect are difficult to reconcile with petitioners' allegations that compliant housing has been virtually unavailable to them in the various communities to which they have been paroled.
Finally, the matter of whether CDCR and, in particular, DAPO are obligated by law to identify compliant housing for petitioners or otherwise assist them in locating and securing such housing,[9] a matter that may factor into resolution of petitioners' claim that section 3003.5(b) is being enforced against them as an unreasonable parole condition that infringes on a number of their fundamental constitutional rights,[10] also appears disputed by the parties. Petitioners point to a statement in CDCR's Policy No. 07-36 that *1283 cautions: "The responsibility to locate and maintain compliant housing shall ultimately remain with the individual parolee through utilization of available resources" (Policy No. 07-36, supra, at p. 2) in support of their allegation that "Respondent has provided little to no assistance to individual parolees attempting to find compliant housing. Petitioners and other noncompliant parolees have not been informed of areas in their counties where compliant housing may be found." CDCR, in turn, "denies the allegation that it provides `little to no assistance to individual parolees attempting to find compliant housing'; it does provide such assistance."
With regard to petitioners' remaining claims, we therefore conclude that evidentiary hearings will have to be conducted to establish the relevant facts necessary to decide each such claim. The trial courts of the counties to which petitioners have been paroled are manifestly in the best position to conduct such hearings and find the relevant facts necessary to decide the claims with regard to each such jurisdiction. These facts would include, but are not necessarily limited to, establishing each petitioner's current parole status; the precise location of each petitioner's current residence and its proximity to the nearest "public or private school, or park where children regularly gather" (§ 3003.5(b)); a factual assessment of the compliant housing available to petitioners and similarly situated registered sex offenders in the respective counties and communities to which they have been paroled; an assessment of the way in which the mandatory parole residency restrictions are currently *1284 being enforced in each particular jurisdiction; and a complete record of the protocol CDCR is currently following to enforce section 3003.5(b) in those respective jurisdictions.

III. DISPOSITION
The claims that section 3003.5(b), construed as a statutory parole condition, is being impermissibly retroactively enforced as to these petitioners, and as thus enforced, constitutes an ex post facto law under the state and federal Constitutions, are denied. For consideration of petitioners' remaining claims, the petition and orders to show cause previously issued are hereby ordered transferred to the Courts of Appeal as follows: In re E.J. on Habeas Corpus, S156933, to the First District Court of Appeal; In re S.P. on Habeas Corpus, S157631, to the Sixth District Court of Appeal; In re J.S. on Habeas Corpus, S157633, and In re K.T. on Habeas Corpus, S157634, to Division One of the Fourth District Court of Appeal, with directions that each matter be transferred to the trial court in the county to which the petitioner has been paroled for further proceedings consistent with the views expressed herein. (Cal. Rules of Court, rule 10.1000(a).) The order staying enforcement of section 3003.5(b) as to these four petitioners, previously issued on October 10, 2007, shall remain in effect.
George, C. J., Chin, J., and Corrigan, J., concurred.
WERDEGAR, J., Concurring.
Before the court today are four petitioners who were convicted of a sexual offense before passage of Proposition 83 (Prop. 83, as approved by voters, Gen. Elec. (Nov. 7, 2006)), who were required by law to register as sex offenders as a result and who have been paroled from prison after passage of Proposition 83. All four petitioners challenge the attempt by the California Department of Corrections and Rehabilitation (CDCR) to enforce against them, as a statutory parole condition, Penal Code section 3003.5, subdivision (b) (hereafter section 3003.5(b)), which was enacted as part of Proposition 83. That new law prohibits sex offender registrants from living "within 2000 feet of any public or private school, or park where children regularly gather." (§ 3003.5(b).) The majority concludes that enforcing this 2,000-foot residency restriction against petitioners as a parole condition does not constitute an impermissible retroactive application of the law nor violate their right to be free of an ex post facto application of the law. The majority remands the balance of petitioners' constitutional claims to the lower courts to permit petitioners to pursue their "as applied" challenges to enforcement of the new residency restrictions against them.
I concur in the majority's result, but not necessarily its reasoning. Specifically, I agree that for these four petitioners, all of whom were convicted of *1285 qualifying sex offenses before passage of Proposition 83 and who were paroled from prison after such passage, enforcing the 2,000-foot residency restriction as a condition of their parole involves no impermissible retroactive or ex post facto application of the law. Under the plain meaning of section 3003.5(b), the critical date is not the date of one's conviction for a qualifying sex crime, nor (contrary to the majority) the date of one's parole from prison. The critical date is instead the date one is found living in noncompliant housing.[1] As the CDCR proposes to enforce section 3003.5(b) as a parole condition against all four petitioners for their living conditions nowthat is, after passage of Proposition 83I agree with the majority's conclusion that such action by the CDCR does not violate any rights petitioners may possess.
But I emphasize the narrowness of both the issue before the court and my agreement with the majority. As the majority recognizes, the Legislative Analyst's description of Proposition 83 and section 3003.5(b) in the official Voter Information Guide stated: "A violation of this provision would be a misdemeanor offense, as well as a parole violation for parolees." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) analysis of Prop. 83 by Legis. Analyst, p. 44, italics added.) As no petitioner presently before the court is threatened with a misdemeanor prosecution, we address in this case the meaning of section 3003.5(b) only as it relates to a condition of parole, and not whether it is also a misdemeanor crime.
Moreover, now before the court are four parolees who were paroled after passage of Proposition 83. We thus also have no occasion here to address whether the 2,000-foot residency limit might apply to those who completed their paroles before the effective date of Proposition 83 (see, e.g., Doe v. Schwarzenegger (E.D.Cal. 2007) 476 F.Supp.2d 1178, 1180 ["John Doe II"]); to those whose parole period began before, but is scheduled to terminate after, that date (id. at pp. 1179-1180 ["John Doe I"]); or even to the thousands of persons subject to sex offender registration who, for whatever reason, are not currently on parole.
Finally, like the majority, I express no opinion on petitioners' various other constitutional challenges to section 3003.5(b) and agree that we must remand these cases to the lower courts to permit the parties to litigate the factual issues necessary to the proper resolution of their respective cases.
With those caveats, I concur in the result reached by the majority.
*1286 MORENO, J., Dissenting.

I.
I respectfully dissent.
Penal Code section 3003.5, subdivision (b) (section 3003.5(b)) cannot be applied to those who suffered their convictions before the date Proposition 83 (Prop. 83, as approved by the voters, Gen. Elec. (Nov. 7, 2006)) was enacted. Nothing in the language of the proposition or in the relevant extrinsic materials supports any other conclusion.[1] Therefore, section 3003.5(b) does not apply to these petitioners and I dissent from the majority opinion's contrary conclusion.
Before I turn to the majority opinion, I begin with a review of "well-established general principles governing the question whether a statutory or constitutional provision should be interpreted to apply prospectively or retroactively." (Strauss v. Horton (2009) 46 Cal.4th 364, 470 [93 Cal.Rptr.3d 591, 207 P.3d 48].) There is a statutory presumption against retroactive application of penal laws, articulated in section 3, first enacted in 1872, which states: "No part of [the Penal Code] is retroactive, unless expressly so declared." This presumption is, as we have noted, rooted in federal "constitutional principles" reflected in such provisions as the ex post facto clause, the Fifth Amendment's takings clause, and the due process clause of the United States Constitution. (Myers v. Philip Morris Companies, Inc. (2002) 28 Cal.4th 828, 841 [123 Cal.Rptr.2d 40, 50 P.3d 751].)
A statute is retroactive when it "change[s] the legal consequences of past conduct by imposing new or different liabilities ...." (Tapia v. Superior Court (1991) 53 Cal.3d 282, 291 [279 Cal.Rptr. 592, 807 P.2d 434].) "California continues to adhere to the time-honored principle ... that in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature or the voters must have intended a retroactive application." (Evangelatos v. Superior Court (1988) 44 Cal.3d 1188, 1208-1209 [246 Cal.Rptr. 629, 753 P.2d 585], italics added.) As we have repeatedly explained, absent an express declaration of retroactivity, "a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature or the voters must have intended a retroactive application." (Id. at p. 1209, italics added.) The key here is clarity: "a statute may be applied retroactively only if it contains express language of retroactivity or if other sources provide a clear and unavoidable implication that the Legislature [or the voters] intended retroactive application." (Myers v. Philip Morris Companies, Inc., supra, 28 Cal.4th at p. 844, second italics added.)
*1287 Ambiguous, vague or inconclusive statements cited as proof of an intention that a statute be applied retroactively are not sufficient for that purpose. "[A]t least in modern times, we have been cautious not to infer the voters' or the Legislature's intent on the subject of prospective versus retrospective operation from `vague phrases' [citation] and `broad, general language' [citation] in statutes, initiative measures and ballot pamphlets." (Californians for Disability Rights v. Mervyn's, LLC (2006) 39 Cal.4th 223, 229-230 [46 Cal.Rptr.3d 57, 138 P.3d 207].) When a statute is ambiguous regarding retroactivity, it is construed to be prospective. (Myers v. Philip Morris Companies, Inc., supra, 28 Cal.4th at p. 841.) Moreover, "a remedial purpose does not necessarily indicate an intent to apply the statute retroactively. Most statutory changes are, of course, intended to improve a preexisting situation and to bring about a fairer state of affairs, and if such an objective were itself sufficient to demonstrate a clear legislative intent to apply a statute retroactively, almost all statutory provisions and initiative measures would apply retroactively rather than prospectively." (Evangelatos v. Superior Court, supra, 44 Cal.3d at p. 1213.)
The question of whether Proposition 83 was intended to apply retroactively has already been recognized, asked, and answered by two decisions of the Court of Appeal and a federal district court judge. They unanimously concluded that Proposition 83 does not contain an express statement of retroactivity. The two Court of Appeal decisions are People v. Whaley (2008) 160 Cal.App.4th 779 [73 Cal.Rptr.3d 133] and Bourquez v. Superior Court (2007) 156 Cal.App.4th 1275 [68 Cal.Rptr.3d 142]. The provision of Proposition 83 at issue in both of those cases was the part of the initiative that extended the commitment terms of persons determined to be sexually violent predators under the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.) from two years to an indeterminate term. (People v. Whaley, supra, 160 Cal.App.4th at pp. 785-786; Bourquez v. Superior Court, supra, 156 Cal.App.4th at pp. 1279-1280.)
In Bourquez, the retroactivity question was whether the new indeterminate term for sexually violent predators could be applied to individuals who had pending recommitment petitions at the time Proposition 83 was enacted. As the starting point of its analysis, the court observed: "Proposition 83 is entirely silent on the question of retroactivity, so we presume it is intended to operate only prospectively. The question is whether applying its provisions to pending petitions to extend commitment is a prospective application." (Bourquez v. Superior Court, supra, 156 Cal.App.4th at p. 1288.) The court ultimately concluded that "[b]ecause a proceeding to extend commitment under the SVPA focuses on the person's current mental state, applying the indeterminate term of commitment of Proposition 83 does not attach new legal consequences to conduct that was completed before the effective date of the law. [Citation.] Applying Proposition 83 to pending petitions to extend *1288 commitment under the SVPA to make any future extended commitment for an indeterminate term is not a retroactive application." (Id. at p. 1289.)
People v. Whaley involved a different twist on the question of whether the change in the law regarding SVPA commitments could be applied retroactively. In Whaley, the People sought to amend the defendant's 1999 SVPA commitment, which had been for two years, and convert it into an indeterminate term under Proposition 83. The trial court granted the People's motion. On appeal, the order was reversed on the ground that applying Proposition 83 to a term of commitment imposed before its enactment constituted an impermissible retroactive application of the initiative. (People v. Whaley, supra, 160 Cal.App.4th at pp. 796-803.) Like the court in Bourquez, the Whaley court found that "[t]he language of Proposition 83 does not contain an express statement of retroactivity." (Whaley, at p. 796.) Furthermore, "[a]lso absent is a clear indication in the statutory language, or in the voter information guide, that the voters intended an indeterminate term to be applied retroactively to completed commitment proceedings." (Ibid.)
The court considered and rejected various interpretations of the statutory language and language in the ballot pamphlet advanced by the People to demonstrate an intent for retroactive application. Significantly, the court was not swayed even by its recognition "that the electorate's intent regarding Proposition 83 was `to strengthen and improve the laws that punish and control sexual offenders.' (Voter Information Guide, Gen. Elec. [(Nov. 7, 2006)] text of Prop. 83, p. 138.)" (People v. Whaley, supra, 160 Cal.App.4th at p. 801.)
While neither Bourquez nor Whaley involved the residency restriction enacted by Proposition 83, Doe v. Schwarzenegger (E.D.Cal. 2007) 476 F.Supp.2d 1178 did. In Doe, the federal district court held that section 3003.5(b) could not be applied retroactively to persons convicted of registrable offenses "prior to the effective date of the statute and who were paroled, given probation, or released from incarceration prior to that date." (Doe, at p. 1179, fn. 1.) At the outset of its analysis, the district court cited the settled rule that "it [was] obligated to adopt the interpretation of the law that best avoids constitutional problems," and expressed its concern that "reading [Prop. 83] retroactively would raise serious ex post facto concerns, and the court is obligated to avoid doing so if it can reasonably construe the statute prospectively." (Id. at p. 1181.)
Like the courts deciding Bourquez and Whaley, the district court noted that Proposition 83 "does not expressly address the issue of retroactivity, but it is well-established in California that statutes operate prospectively unless there is clear evidence of intent to the contrary." (Doe v. Schwarzenegger, supra, 476 *1289 F.Supp.2d at p. 1181.) The court concluded "it is not `very clear' from extrinsic sources that the intent of the voters was to make [Prop. 83] retroactive." (Id. at p. 1182.) The court rejected the state's assertion that language in the ballot pamphlet regarding the number of registered sex offenders in California, and the intent of the initiative to create predator-free zones, evinced a clear intention that the initiative be retroactively applied. "First, the reference to the number of sex offenders in California is a neutral statement of fact, which voters could have reasonably construed as characterizing the scope of the problem and its potential expansion, rather than as purporting to address the problem in its entirety. Second, while the term `predator free zones' is troubling, it is not `very clear' that it contemplates retroactive application. Rather, it is the type of sloganeering to be expected of an argument in favor of the law, not to be taken literally. The [initiative] does not, for instance, bar sex offenders from entering the 2,000 feet zone around schools or parks; it only prohibits them from residing there. Accordingly, voters could reasonably interpret the quoted language as creating a goal of establishing `predator free zones,' which the [initiative] takes one step toward achieving, albeit prospectively." (Ibid.)
In light of this unanimity among the courts that have addressed the retroactivity issue, the majority opinion's conclusion that application of section 3003.5(b) to these petitioners is prospective rather than retroactive is remarkable. The majority opinion reaches this conclusion purportedly by examining the "plain language" of section 3003.5(b) under which, it says, "any convicted sex offender already subject to the lifetime registration requirement who is released from custody on parole, whether it be after serving a term in custody for an initial sex offense conviction, a new sex offense conviction, or a new nonsex offense conviction, becomes subject to the new mandatory residency restrictions for the duration of his term." (Maj. opn., ante, at p. 1272.)
Citing People v. Grant (1999) 20 Cal.4th 150 [83 Cal.Rptr.2d 295, 973 P.2d 72], the majority opinion reasons that the crucial date for the retroactivity analysis in this case is not the petitioners' long ago convictions of the registrable offenses but the dates of their release on parole from recent, nonsexual offenses: "Section 3003.5(b) places restrictions on where a paroled sex offender subject to lifetime registration pursuant to section 290 may reside while on parole. For purposes of retroactivity analysis, the pivotal `last act or event' (Grant, supra, 20 Cal.4th at p. 157) that must occur before the mandatory residency restrictions come into play is the registered sex offender's securing of a residence upon his release from custody on parole." (Maj. opn., ante, at p. 1274.)
*1290 A plain language reading of the statute does not support the majority opinion's result. The statute says simply: "Notwithstanding any other provision of law, it is unlawful for any person for whom registration is required pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather." (§ 3003.5, subd. (b).) It does not refer to parole at all, much less bear the weight of interpretation that the majority opinion would give ite.g., "any convicted sex offender already subject to the lifetime registration requirement who is released from custody on parole, whether it be after serving of a term in custody for an initial sex offense conviction, a new sex offense conviction, or a new nonsex offense conviction, becomes subject to the new mandatory residency restrictions for the duration of his parole term." (Maj. opn., ante, at p. 1272.)
Indeed, as the majority opinion acknowledges, it is not entirely clear to whom section 3003.5(b) appliesall registered sex offenders or only those released on parole. (See maj. opn., ante, at p. 1271 & fn. 5.) Enforcement of the residency restriction against parolees is not mandated by the plain language of the statute; it was an administrative decision by the California Department of Corrections and Rehabilitation (CDCR) reached eight months after Proposition 83 was enacted. (See CDCR, Policy No. 07-36: Implementation of Prop. 83, aka Jessica's Law (Aug. 17, 2007); Cal. Code Regs., tit. 15, § 2616, subd. (a)(15).) Therefore, nothing in the plain language of the statute supports the majority opinion's assertion that section 3003.5(b) was intended to apply prospectively to parolees upon their release from custody on parole.[2]
Moreover, the majority opinion's characterization of what constitutes the pivotal date for purposes of retroactivity analysis in this case is simply wrong. These petitioners did not become subject to the residency restriction when they were released from custody on parole for nonsexual offenses; they were subject to the residency restriction by virtue of their status as registered sex offenders and they acquired that status upon their convictions for their sex offenses. (See People v. McClellan (1993) 6 Cal.4th 367, 380 [24 Cal.Rptr.2d 739, 862 P.2d 739] ["the sex offender registration requirement... *1291 is ... a statutorily mandated element of punishment for the underlying offense"]; Barrows v. Municipal Court (1970) 1 Cal.3d 821, 825 [83 Cal.Rptr. 819, 464 P.2d 483] [§ 290 "applies automatically when a person is convicted of one of the enumerated offenses" (italics added)].) Indeed, the current registration law in effect requires eligible offenders to register even before they are released from prison. (§ 290.016.) Clearly, the registration requirement is imposed upon conviction of the registrable offense as are all ancillary restrictions that flow from that requirement including the residency restriction. Therefore, for purposes of the retroactivity analysis here, the pivotal date is the date of conviction for the registrable offense.
None of the three authorities upon which the majority opinion so heavily reliesPeople v. Grant, supra, 20 Cal.4th 150, Bourquez v. Superior Court, supra, 156 Cal.App.4th 1275, and People v. Mills (1992) 6 Cal.App.4th 1278 [8 Cal.Rptr.2d 310]compels a different result because each one is distinguishable.
Grant is factually distinguishable because it involved the violation of a statutecontinuous sexual abuse (§ 288.5, subd. (a))in which some events occurred before the date of the statute's effective date but others clearly occurred afterwards. (Grant, supra, 20 Cal.4th at p. 153.) Additionally, the jury was instructed that it could convict the defendant of the offense only if it found "that one of the required minimum of three acts of molestation occurred after section 288.5's effective date. In other words, defendant could be convicted only if the course of conduct constituting the offense of continuous sexual abuse was completed after the new law became effective. Because the last act necessary to trigger application of section 288.5 was an act of molestation that defendant committed after section 288.5's effective date, defendant's conviction was not a retroactive application of section 288.5 and therefore not a violation of the statutory prohibition against retroactive application of the Penal Code." (Grant, supra, 20 Cal.4th at pp. 157-158, first italics added.) In this case, the conduct which is the basis for application of section 3003.5(b) did not straddle the effective date of Proposition 83. That conduct which led to petitioners' convictions and triggered the registration requirement occurred long before passage of Proposition 83.
Bourquez is also inapposite. As the Court of Appeal observed, pending proceedings to extend commitment under the SVPA focus on current dangerousness and, therefore, the change in law that extended commitment indefinitely did not attach new legal consequences to past conduct. (Bourquez v. Superior Court, supra, 156 Cal.App.4th at p. 1289.) In contrast, the residency restriction relates back to the original convictions for which the petitioners in this case were required to register as sex offenderstherefore, retroactive *1292 application of section 3003.5(b) does "change[] the legal consequences of past conduct by imposing new or different liabilities" (Tapia v. Superior Court, supra, 53 Cal.3d at p. 291) than existed at the time of the convictions.
In Mills, the defendant suffered a 1981 felony conviction for being in possession of marijuana for sale. In 1990, he was arrested and charged with being a felon in possession of a firearma shotgun. At the time of his 1981 felony conviction, however, the weapons statute proscribed possession of concealed weapons only. It was not until 1989 that the statute was amended to prohibit possession of any firearm, effective in 1990. (People v. Mills, supra, 6 Cal.App.4th at p. 1282.) The defendant argued that charging him under the amended version of the weapons statute violated the proscription against ex post facto laws because "the 1990 change in the law increases the punishment for his 1981 conviction, and is therefore a prohibited ex post facto law." (Id., at p. 1283.)
The Court of Appeal rejected the argument: "Here defendant was convicted of conduct, his possession of a shotgun, occurring after the effective date of the statute. His conduct was a violation of the new statute, rather than an increase of punishment for the earlier offense of possessing marijuana for sale. Although the statute only applied to him because of his status as a person convicted of a felony, and the felony conviction occurred before the statute became effective, the fact of his prior conviction only places him into a status which makes the new law applicable to him. The legal consequences of his past conduct were not changedonly a new law was applied to his future conduct." (People v. Mills, supra, 6 Cal.App.4th at p. 1286, fn. omitted.) In reaching this conclusion, the court drew an analogy to habitual offender statutes, noting that "courts have generally held that a statute which increases the punishment of prior offenders is not an ex post facto law if it is applied to events occurring after its effective date." (Ibid.)
Analytically, Mills is distinguishable from the case before us. Crucial to the court's analysis in Mills was the violation by the defendant of a penal statute that was unrelated to the underlying conduct which had led to his earlier conviction for drug possession. In other words, the defendant was initially convicted of, and punished for, possession of a drug for sale. His later conviction was not related to his possession of marijuana but to his possession of a firearmtwo entirely separate events. It is true that his earlier conviction gave rise to his felon status which then became an element of the second offense, but he was not being punished for his felon status aloneit was his status plus conduct that was entirely unrelated to his earlier drug possession. The court's reliance on habitual offender statutes reinforces this point. While conviction for prior felonies may make an offender eligible for enhanced punishment if he commits a new crime, the conduct for which the *1293 defendant was punished in the earlier conviction is not the basis for the enhanced punishment for the subsequent conviction.
In this case, however, the residency restriction applies to petitioners for no other reason than their status as registered sex offenders, which was triggered by the conduct that led to their convictions of the qualifying sex offenses. The residency restriction has no other object than to increase the legal disabilities imposed upon registered sex offenders because of their earlier conduct. This is made abundantly clear by Proposition 83's statement of purpose: "California must also take additional steps to monitor sex offenders, to protect the public from them, and to provide adequate penalties for and safeguards against sex offenders, particularly those who prey on children." (Prop. 83, § 2, subd. (h), italics added.) The intent of Proposition 83 was to impose further restrictions on registered sex offenders based on the conduct that had led to their qualifying convictions. Thus, the analogy to Mills fails.
Stripped of its analytical garb, the majority opinion's analysis is transparently bare. The majority cannot find either in the plain language of section 3003.5(b) or in the ballot pamphlet an explicit statement or a clear and unavoidable implication that the residency restriction was intended to be applied retroactively to individuals like petitioners whose qualifying offenses for registration purposes occurred long before Proposition 83 was applied. Instead, the majority dismisses the issue by clinging to the fiction that release upon parole is the pivotal date for retroactivity analysis and, therefore, application to these petitioners is prospective.
Ironically, this is the same implausible argument that we unanimously repudiated in Strauss v. Horton, supra, 46 Cal.4th 364. In Strauss, the interveners argued that Proposition 8banning same-sex marriages in Californiaapplied to such marriages performed before enactment of the initiative, during the period when same-sex couples were allowed to marry by virtue of our decision in In re Marriage Cases (2008) 43 Cal.4th 757 [76 Cal.Rptr.3d 683, 183 P.3d 384]. The argument advanced by the interveners was that, because Proposition 8 banned same-sex marriages after its enactment "the measure is not being applied retroactively but rather prospectively, even if the marriages that are now (or in the future would be) denied recognition were performed prior to the adoption of Proposition 8." (Strauss, supra, 46 Cal.4th at p. 471.) We easily saw through this argument: "Were Proposition 8 to be applied to invalidate or to deny recognition to marriages performed prior to November 5, 2008, rendering such marriages ineffective in the future, such action would take away or impair vested rights acquired under the prior state of the law and would constitute a retroactive application of the measure." (Id. at p. 472.)
*1294 In this case, retroactive application of Proposition 83 would clearly "`"attach[] a new disability, in respect to transactions or considerations already past"'" (Myers v. Philip Morris Companies, Inc., supra, 28 Cal.4th at p. 839; see Strauss v. Horton, supra, 46 Cal.4th at pp. 471-472), thus rendering it retroactive here as application of Proposition 8 would have been in that case. The majority opinion thereby gives effect to an intent that was nowhere expressed in the initiative or the ballot pamphlet even if, in the process, our carefully developed retroactivity jurisprudence is eviscerated. I cannot join in this plain and unjustified rejection of long-standing retroactivity principles.

II.
Given the majority's conclusion on the retroactivity issue, this case will need to be remanded for further proceedings. As the majority states, the trial courts on remand must determine the relevant facts necessary to decide petitioners' as-applied challenges, which "would include, but are not necessarily limited to, establishing each petitioner's current parole status; the precise location of each petitioner's current residence and its proximity to the nearest `public or private school, or park where children regularly gather' (§ 3003.5(b)); a factual assessment of the compliant housing available to petitioners and similarly situated registered sex offenders in the respective counties and communities to which they have been paroled; an assessment of the way in which the mandatory parole residency restrictions are currently being enforced in each particular jurisdiction; and a complete record of the protocol CDCR is currently following to enforce section 3003.5(b) in those respective jurisdictions." (Maj. opn., ante, at pp. 1283-1284.)
Also to be considered on remand is the extent to which even moderate safety restrictions may infringe on the constitutional right to intrastate travel. "The right of intrastate travel has been recognized as a basic human right protected by article I, sections 7 and 24 of the California Constitution." (Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1100 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) This right has been elaborated in the context of child custody disputes where, it has been said, the right to intrastate travel also embraces "the concomitant right not to travel." (In re Marriage of McGinnis (1992) 7 Cal.App.4th 473, 480 [9 Cal.Rptr.2d 182].) "Courts cannot order individuals to move to and live in a community not of their choosing." (In re Marriage of Fingert (1990) 221 Cal.App.3d 1575, 1581 [271 Cal.Rptr. 389].)
The Courts of Appeal have struck down various probation conditions because they violated the constitutional right to intrastate travel. In In re White (1979) 97 Cal.App.3d 141 [158 Cal.Rptr. 562] the defendant was convicted of prostitution. The trial court imposed a condition of probation that barred *1295 her from entering areas of the cityFresnowhere there was prostitution activity. The reviewing court struck the condition. The court noted, with respect to the constitutional issues raised by the defendant that "[w]hile White's reasonable expectations regarding association and travel have necessarily been reduced, the restriction should be regarded with skepticism. If available alternative means exist which are less violative of the constitutional right and are narrowly drawn so as to correlate more closely with the purposes contemplated, those alternatives should be used." (Id. at p. 150; see also People v. Beach (1983) 147 Cal.App.3d 612, 622-623 [195 Cal.Rptr. 381]; People v. Bauer (1989) 211 Cal.App.3d 937, 944-945 [260 Cal.Rptr. 62].)
Most recently, in People v. Smith (2007) 152 Cal.App.4th 1245 [62 Cal.Rptr.3d 316] (Smith), the Court of Appeal struck down a blanket probation condition imposed on all registered sex offenders by the Los Angeles probation department that forbid them from leaving the county for any reason. As the court observed: "Smith has a constitutional right to intrastate travel [citations] which, although not absolute, may be restricted only as reasonably necessary to further a legitimate governmental interest." (Id. at p. 1250.) The court found no such reasonable necessity in that case, concluding, inter alia, that "the prohibition bears no reasonable relation to the crime." (Id. at p. 1252.)
We do not consider a probation condition in the present case. But whether section 3003.5(b) is viewed as a parole condition or a condition imposed by statute that extends beyond parole, the analysis is the same: a restriction on where an ex-offender may live infringes upon that person's right to intrastate travel, which includes as one component the right to choose where to live and not to live. That right is not absolute, but the infringement may be imposed "only as reasonably necessary to further a legitimate governmental interest." (Smith, supra, 152 Cal.App.4th at p. 1250.)
It is of course true, as the majority points out, that "`[a]lthough a parolee is no longer confined in prison[,] his custody status is one which requires and permits supervision and surveillance under restrictions which may not be imposed on members of the public generally.'" (Maj. opn., ante, at pp. 1282-1283, fn. 10, quoting People v. Burgener (1986) 41 Cal.3d 505, 531 [224 Cal.Rptr. 112, 714 P.2d 1251].) As the majority recognizes, however, even if the statute is interpreted to impose no more than parole conditions, such conditions "`must be reasonable, since parolees retain constitutional protection against arbitrary and oppressive official action.'" (Maj. opn., ante, at p. 1282, fn. 10, quoting Terhune v. Superior Court (1998) 65 Cal.App.4th 864, 874 [76 Cal.Rptr.2d 841].) The reasonableness of parole conditions is gauged by the same standard developed in the context of probation conditions *1296 in People v. Dominguez (1967) 256 Cal.App.2d 623 [64 Cal.Rptr. 290], and adopted by this court in People v. Lent (1975) 15 Cal.3d 481 [124 Cal.Rptr. 905, 541 P.2d 545] (Dominguez/Lent). As explained in Dominguez: "A condition of probation which (1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality does not serve the statutory ends of probation and is invalid." (Dominguez, supra, 256 Cal.App.2d at p. 627; see Lent, supra, 15 Cal.3d at p. 486.) The Dominguez/Lent criteria applies to evaluating the reasonableness of parole conditions. (People v. Burgener, supra, 41 Cal.3d at p. 532; In re Stevens (2004) 119 Cal.App.4th 1228, 1233 [15 Cal.Rptr.3d 168]; In re Naito (1986) 186 Cal.App.3d 1656, 1661 [231 Cal.Rptr. 506].)
Section 3003.5(b)'s residency restrictions apply without exception to those who have committed certain enumerated sex offenses and are required to register as a sex offender. However, in the case of petitioners K.T. and E.J., there is no indication from the record that their sexual offenses involved children, and it is unclear why they should be subject to the statute's residency restrictions, which as the majority explains, is for the purpose of protecting children by "creating `predator free zones around schools and parks to prevent sex offenders from living near where our children learn and play' . . . ." (Maj. opn., ante, at p. 1266, quoting Voter Information Guide, Gen. Elec., supra, argument in favor of Prop. 83, p. 46.) The application of the statute to these two petitioners would appear to be not merely not in furtherance of the statute's goal, but actually contrary to that goal, since it would divert scarce law enforcement resources toward enforcing a restriction that has no demonstrable effect on increasing child safety. Nor, if viewed strictly as a parole condition, would the statutory restriction appear to bear any relationship to the crimes of which these petitioners were convicted. (See In re Stevens, supra, 119 Cal.App.4th at p. 1233.)
On the other hand, petitioner S.P. was convicted of raping a 15-year-old girl when he was 16. Also, it is unclear whether the Texas sex offense of which petitioner J.S. was convicted, which has as an element the "`intent to arouse or gratify the sexual desire of any person'" involved a minor as an actual or intended or potential victim. (Maj. opn., ante, at p. 1269.) As to S.P. and possibly to J.S., in order to determine whether the right to intrastate travel is violated, the severity of the restriction must be determined as well as whether such severity is justified in furtherance of the statutory goal.
*1297 It is not the function of courts to judge the wisdom of a statute, but it is their function to determine its constitutionality. When a statutory restriction substantially impinges on a person's constitutional right to intrastate travel and does not further the statute's objective, it must be struck down as to that person.[3] Whether such an outcome is appropriate for the as-applied challenges in the present case is a matter to be determined on remand.
Kennard, J., concurred.
NOTES
[1] All further undesignated statutory references are to the Penal Code.
[2] Section 290 imposes upon individuals convicted of certain sex offenses a lifetime requirement that they register with law enforcement in the communities in which they reside.
[3] On October 11, 2007, the CDCR issued a revised policy for the implementation of section 3003.5(b), requiring noncompliant parolees to either "immediately provide a compliant residence or declare themselves transient." (CDCR, Policy No. 07-48: Revised Procedures for Jessica's Law Notice to Comply (Oct. 11, 2007) [amending Policy No. 07-36].)
[4] Petitioners requested that we permit their supporting declarations to be filed under seal and to otherwise not disclose their identities given the particular subject matter of these proceedings. In a departure from our usual practice (see Cal. Style Manual (4th ed. 2000) § 5:9, pp. 179-180), we granted their request. Upon transfer of the petition and orders to show cause previously issued on all remaining claims to the lower courts, those courts are free to reevaluate the necessity of conducting further proceedings under seal and not disclosing the identities of petitioners.
[5] The further question of whether section 3003.5(b) also created a separate new misdemeanor offense applicable to all sex offenders subject to the registration requirement of section 290, irrespective of their parole status, is not before us, as there is no allegation or evidence that these petitioners, or any other registered sex offenders, whether on parole or otherwise, have ever been separately charged with such an offense under the new provision.
[6] To be contrasted with the holding in Bourquez is the holding in People v. Whaley (2008) 160 Cal.App.4th 779 [73 Cal.Rptr.3d 133]. As in Bourquez, the provision at issue in Whaley was that part of Jessica's Law that extended the commitment terms of sexually violent predators under the SVPA from two years to an indeterminate term. (Whaley, at pp. 785-786.) Unlike Bourquez, however, which involved a recommitment petition already pending at the time Jessica's Law was passed, in Whaley the People simply petitioned the court to summarily convert the defendant's preexisting two-year fixed-term commitment as a sexually violent predator into an indeterminate term under the new law after the provision had passed.
[7] CDCR also takes the position that if section 3003.5(b) is being applied retroactively to these petitioners, then the language of the initiative measure itself, as well as statements in the ballot pamphlet submitted to the voters, reflect that the new parole residency restrictions were plainly intended to have such retroactive effect. We need not and do not address the contention given our conclusion that section 3003.5(b) is only being applied prospectively to these petitioners.
[8] CASOMB comprises representatives from the Attorney General's office, CDCR, regional parole administration, the judicial branch, district attorneys' offices, public defenders' offices, probation departments, law enforcement agencies, as well as victims advocates and licensed treatment providers, among others.
[9] It bears observing that a parole term is a component of the inmate's original sentence, and that parolees remain in the constructive custody of CDCR for the duration of their fixed parole terms and are not formally "discharged" from the department's custody until the expiration of the parole term. (See §§ 3000, subd. (a)(1), 3056.) CDCR has a statutory obligation to "assist parolees in the transition between imprisonment and discharge." (§§ 3000, subd. (a)(1), 3074.) The extent to which such obligation includes assisting sex offender registrant parolees in identifying or securing housing in compliance with section 3003.5(b) in the communities to which they are paroled remains unclear.
[10] As emphasized at the outset, petitioners here challenge only the enforcement of section 3003.5(b) as a statutory parole condition setting forth residency restrictions applicable to paroled registered sex offenders like themselves. There is no evidence before us of any attempts, to date, to enforce the statute outside of that limited context. Accordingly, in this case, the inquiry into petitioners' challenge to section 3003.5(b) as an unreasonable statutory parole condition that infringes on their constitutional rights is necessarily circumscribed. The Legislature has given the CDCR and its DAPO expansive authority to establish and enforce rules and regulations governing parole, and to impose any parole conditions deemed proper. (§§ 3052, 3053; see Terhune v. Superior Court (1998) 65 Cal.App.4th 864, 874 [76 Cal.Rptr.2d 841] (Terhune).) "These conditions must be reasonable, since parolees retain constitutional protection against arbitrary and oppressive official action." (Terhune, at p. 874; see also In re Stevens (2004) 119 Cal.App.4th 1228, 1234 [15 Cal.Rptr.3d 168]; People v. Thompson (1967) 252 Cal.App.2d 76, 84 [60 Cal.Rptr. 203].) "Nevertheless, the conditions may govern a parolee's residence, his associates or living companions, his travel, his use of intoxicants, and other aspects of his life." (Terhune, at p. 874, italics added; see generally Morrissey v. Brewer (1972) 408 U.S. 471, 482 [33 L.Ed.2d 484, 92 S.Ct. 2593] [parolees have fewer constitutional rights than do ordinary persons]; People v. Burgener (1986) 41 Cal.3d 505, 531-532 [224 Cal.Rptr. 112, 714 P.2d 1251] (Burgener), overruled on other grounds in People v. Reyes (1998) 19 Cal.4th 743, 754, 756 [80 Cal.Rptr.2d 734, 968 P.2d 445].)

The dissent suggests that "[w]hen a statutory restriction substantially impinges on a person's constitutional right to intrastate travel and does not further the statute's objective, it must be struck down as to that person." (Dis. opn. of Moreno, J., post, at p. 1297 & fn. 3 [suggesting the same result for a violation of the state constitutional right of privacy].) But here, the threshold question common to all of petitioners' remaining as-applied constitutional challenges to section 3003.5(b) is whether the section, when enforced as a statutory parole condition against registered sex offenders, constitutes an unreasonable parole condition to the extent it infringes on such parolees' fundamental rights. "Although a parolee is no longer confined in prison[,] his custody status is one which requires and permits supervision and surveillance under restrictions which may not be imposed on members of the public generally." (Burgener, supra, 41 Cal.3d at p. 531; see In re Stevens, supra, 119 Cal.App.4th at p. 1233.) Hence, the limited nature of the rights retained by registered sex offenders while serving out a term of parole, whether it be with regard to the right to travel, to privacy, or to associate with persons of one's choosing, must inform the inquiry as to whether section 3003.5(b) places reasonable or unreasonable restrictions on the paroles of registered sex offenders.
[1] Section 3003.5(b) provides: "Notwithstanding any other provision of law, it is unlawful for any person for whom registration is required pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather."
[1] All further statutory references are to the Penal Code.
[2] The fact that it took eight months for someone to decide how and against whom section 3003.5(b) was to be enforced also undermines the repeated assertions by the majority opinion that these petitioners were on notice that the restriction applied to them as soon as they were released on parole and, even less accurately, the implication that, armed with this knowledge, they intentionally moved into noncompliant housing. (Maj. opn., ante, at pp. 1272, 1275-1278.) If those charged with enforcing the residency restriction did not understand its scope or application until months after it was enacted, how can these petitioners be charged with notice, actual or constructive, that it applied to them at any point before they were served with the 45-day compliance letter? They cannot. How can they have flouted a condition of parole which had not yet been applied to them when they moved into residences later determined to be noncompliant? They did notthey were just going home.
[3] The restrictions imposed by section 3003.5(b) may also violate the right to privacy found in article I, section 1 of the California Constitution. (See Robbins v. Superior Court (1985) 38 Cal.3d 199, 213-215 [211 Cal.Rptr. 398, 695 P.2d 695] [the privacy clause's protection of individual autonomy forbids government from requiring individuals receiving public assistance benefits to give up their homes and live in county facilities].)